**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**Jimmy Smithson,**

Plaintiff,

v.

**Union Pacific Railroad Company,**

Defendant.

Case No. 5:21-CV-01225-XR

# DEFENDANT UNION PACIFIC RAILROAD COMPANY'S RENEWED MOTION FOR SUMMARY JUDGMENT

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

Lara C. de Leon (TX #24006957)
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (512) 382-8800
ldeleon@constangy.com

***Attorneys for Defendant***
***Union Pacific Railroad Company***

# TABLE OF CONTENTS


**I. INTRODUCTION** ........ 8

**II. STATEMENT OF UNCONTESTED FACTS ("SOF")** ........ 9

- **A. The Parties** ........ 9
- B. The Applicable FRA Regulations ........ 11
- C. Union Pacific's Previous CVFT ........ 13
- D. The 2012 Goodwell, Oklahoma Collision and NTSB Investigation ........ 13
- E. The FRA's 2015 Publications ........ 14
- F. Union Pacific's Light Cannon CVFT ........ 16
- G. Smithson's Failed Color Vision Exams in 2018 ........ 19

**III. ARGUMENT AND AUTHORITIES** ........ 23

- A. Smithson Failed to Exhaust His Administrative Remedies Through the FRA. ........ 23
  - 1. Administrative exhaustion is required when employee fitness falls squarely within the regulatory scheme and substantive expertise of the FRA. ........ 23
  - 2. Indisputably, Smithson did not even attempt the FRA administrative review process. ........ 25
- B. Nonetheless, Smithson's Disparate Treatment Claim Still Fails as a Matter of Law. ........ 27
  - 1. Smithson Does Not Have Direct Evidence of Discrimination. ........ 28
  - 2. Smithson Cannot Meet His Burden with Indirect Evidence Either. ........ 29
    - a. Smithson was not qualified under the ADA because he could not satisfy the FRA's mandatory color vision standard for recertification and he failed to appeal through the FRA. ........ 29
    - b. Smithson's attempts to challenge the Light Cannon test are immaterial and, in any event, fail. ........ 31
    - c. Regardless, Union Pacific had legitimate, non-discriminatory reasons for its actions and Smithson cannot prove pretext. ........ 34
- C. Smithson's Punitive Damages Claim Also Fails. ........ 36

**III. CONCLUSION** ........ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Albertson's Inc. v. Kirkingburg*,
527 U.S. 555 (1999) ........ 24, 27

*Barrett v. Union Pac. R.R. Co*.,
No. 19-cv-06377-CV, 2021 WL 233129 (N.D. Cal. Jan. 25, 2021) ........ 37

*Best v. UTI Logistics*,
No. G:06-0300, 2008 WL 62210 (S.D. Tex. Jan. 3, 2008) ........ 35

*Bey v. City of N.Y.*,
999 F.3d 157 (2d Cir. 2021) ........ 35

*Bibbs v. Motiva Enters. LLC*,
No. 1:23-CV-00315, 2024 WL 5088130 (E.D. Tex. Nov. 20, 2024) ........ 29

*Bower v. Fed. Express Corp.*,
156 F. Supp. 2d 678 (W.D. Tenn. 2001) ........ 32

*Brunskill v. Kansas City S. Ry. Co*.,
No. 06-00205-CV-W-REL, 2008 WL 413281 (W.D. Mo. Feb. 12, 2008),
*aff'd*, 331 Fed. App'x. 426, 2009 WL 2448265 (8th Cir. 2009) ........ 31

*Cannizaro v. Neiman Marcus, Inc.*,
979 F. Supp. 465 (N.D. Tex. 1997) ........ 30

*Cicalese v. Univ. of Tex. Med. Branch*,
924 F.3d 762 (5th Cir. 2019) ........ 28

*Clark v. Champion Nat'l Sec., Inc.*,
952 F.3d 570 (5th Cir. 2020) ........ 28, 29

*Cromeens v. Union Pac. R.R. Co.*,
805 F. Supp. 3d 1062 (D. Neb. 2025) ........ 24, 31

*Gober v. Frankel Family Trust*,
537 Fed. App'x. 518 (5th Cir. 2013) ........ 30

*Gonzales v. City of New Braunfels*,
176 F.3d 834 (5th Cir. 1999) ........ 30

*Harris v. Dallas Cnty. Hosp. Dist.*,
No. 3:14-CV-3663-D, 2016 WL 2914847 (N.D. Tex. May 19, 2016) ........ 30

*Harris v. P.A.M. Transp., Inc.*,
339 F.3d 635 (8th Cir. 2003) ....................23, 24, 31

*Hinojosa v. Jostens Inc.*,
128 Fed. App'x. 364 (5th Cir. 2005) ....................29

*INS v. Ventura*,
537 U.S. 12 (2002) ....................24

*Ketcher v. Wal-Mart Stores, Inc.*,
122 F. Supp. 2d 747 (S.D. Tex. 2000) ....................29

*Kitchen v. BASF*,
952 F.3d 247 (5th Cir. 2020) ....................28

*Kolstad v. American Dental Ass'n*,
527 U.S. 526 (1999) ....................36

*Lane v. R.A. Sims, Jr.*,
241 F.3d 439 (5th Cir. 2001) ....................24

*Laxton v. Gap Inc.*,
333 F.3d 572 (5th Cir. 2003) ....................29

*In re Marlow*,
FRA Docket FRA-2017-0049 ....................18

*Mosley v. Bexar Cnty.*,
No. SA-17-CV-00583-XR, 2020 WL 589540 (W.D. Tex. Feb. 5, 2020) ....................35

*Nall v. BNSF Ry. Co.*,
917 F.3d 335 (5th Cir. 2019) ....................28

*In re Pendergraft*,
FRA Docket EQAL-2017-13 ....................18

*Peters v. Union Pac. R.R. Co.*,
80 F.3d 257 (8th Cir. 1996) ....................25

*Polak v. Sterilite Corp.*,
No. 3:19-CV-2972-D, 2021 WL 1753757 (N.D. Tex. May 4, 2021), *aff'd*, No. 21-10549, 2022 WL 457822 (5th Cir. Feb. 15, 2022) ....................29

*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003) ....................28, 35

*Rizzo v. Blues Mgmt., Inc.*,
No. 4:16-cv-01017, 2017 WL 549016 (S.D. Texas, January 24, 2017) ....................36

*Roby v. Frontier Enters., Inc.*,
No. SA–11–CV–368–XR, 2012 WL 4321312 (W.D. Tex. Sept. 19, 2012)............................23

*Sears v. Zions Bancorporation NA*,
No. 21-10448, 2022 WL 1800779 (5th Cir. June 2, 2022)....................................................35

*Sharbono v. N. States Power Co.*,
218 F. Supp. 3d 1004 (D. Minn. 2016)....................................................................................36

*Trautman v. Time Warner Cable Tex., LLC*,
No. A-16-CV-1049-LY, 2017 WL 5985573 (W.D. Tex. Dec. 1, 2017) ................................30

*Trevillion v. Union Pac. R.R.*,
No. 18-610, 2021 WL 1762112 (W.D. La., May 4, 2021) .....................................................29

*Turner v. BNSF Railway Co.*,
138 F.4th 224 (5th Cir. 2025) ............................................................................................ *passim*

*Vaughn v. FedEx Freight, Inc.*,
421 F. Supp. 3d 1302 (N.D. Ala. 2019)...................................................................................36

*Weeks v. Union Pac. R.R. Co.*,
No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123 (E.D. Cal. May 3, 2017)..........................25

*Williams v. J.B. Hunt Transport*,
826 F.3d 806 (5th Cir. 2016) ..................................................................................................36

*Williams v. Trader Pub. Co.*,
218 F.3d 481 (5th Cir. 2000) ..................................................................................................36

*Wilson v. L&B Realty Advisors, LLP*,
No. 3:20-CV-2059-G, 2022 WL 102564 (N.D. Tex. Jan. 11, 2022)......................................35

*Zaragoza v. Union Pacific R.R. Co.*,
Case No. EP-21-CV-287-KC (W.D. Tex. Oct. 31, 2025) .....................................................31

**Federal Statutes and Rule**

28 U.S.C. § 2342(7) ..................................................................................................................25

42 U.S.C. § 12111(8) ..................................................................................................................30

42 U.S.C. § 12112(a) ..................................................................................................................27

42 U.S.C. § 12112(d)(4) ..............................................................................................................29

49 U.S.C. § 20101......................................................................................................................24

49 U.S.C. § 20114(c) ..................................................................................................................25

49 U.S.C. § 20135(a) .....24

49 U.S.C. § 20135(d) .....24

Fed. R. Civ. P. 56 .....8

**Regulations**

9 C.F.R. § 242.109(a)(2) .....12

9 C.F.R. § 117(b), (h)(3) .....23

29 C.F.R. § 1630.2(m) .....29

29 C.F.R. § 1630.14(c) .....29

49 C.F.R. § 240.121(c) .....15

49 C.F.R. § 240.121(c)(3) .....11

49 C.F.R. pt. 240 .....11

49 C.F.R. pt. 240 Appendix F .....18, 34

49 C.F.R. pt. 242 Appendix D .....18, 34

49 C.F.R. pt. 242 Appendix D(2) .....12, 22

49 C.F.R. pt. 242 Appendix D(4) .....12, 13, 33

49 C.F.R. § 240.207 .....20

49 C.F.R. § 242.1(a) .....12

*49* C.F.R. § 242.3(a) .....10

49 C.F.R. § 242.117 .....18, 20, 23

49 C.F.R. § 242.117(h)(3) .....11, 23

49 C.F.R. § 242.117(j) .....12

49 C.F.R. § 242.501 .....23

49 C.F.R. § 242.503 (2012). .....23

49 C.F.R. §§ 242.501, *et seq.* .....25

80 Fed. Reg. 73,122, at 73,124 .....33

**Other**

*Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73,122 (Nov. 24, 2015) ................................................12, 16, 19, 33

*Conductor Certification*, 76 Fed. Reg. 69,802, 69,822, 69,834 (Nov. 9, 2011) ............................11

*Qualification & Certification of Locomotive Engineers*, 64 Fed. Reg. 60, 966, 60, 984 (Nov. 8, 1999). .........................................................................................................11

Defendant Union Pacific Railroad Company, in accordance with Fed. R. Civ. P. 56, Local Rule CV-7(C), and this Court's December 3, 2025 Scheduling Order (ECF No. 68) moves for summary judgment on Plaintiff Jimmy Smithson's remaining claim of disparate treatment in violation of the Americans with Disabilities Act ("ADA"). Union Pacific states as follows:

## I. INTRODUCTION

Jimmy Smithson worked for Union Pacific as a conductor—a safety-sensitive position governed by the Federal Railroad Administration ("FRA"). Under FRA regulations, conductors must pass a color vision screening test every three years in order to be recertified for their positions. The regulations specify certain tests that can be used for the initial screening (here, an Ishihara test) and give the railroad's chief medical officer the discretion to further evaluate individuals who fail the initial screening through a color vision field test ("CVFT") to determine if they can satisfy the FRA's color vision standards.

These regulations are important as railroads use colored wayside signals that must be identified properly. If signals are misidentified, the consequences are severe—as illustrated by the 2012 Goodwell train collision. There, a locomotive engineer misidentified a signal due to a color vision deficiency and caused a fatal, head-on collision between two Union Pacific freight trains. After the accident, the National Transportation Safety Board ("NTSB") criticized Union Pacific's color vision testing program and recommended improvements.

At issue here is Union Pacific's current CVFT, known as the Light Cannon, which was developed in response to NTSB recommendations and FRA guidance after the Goodwell collision. In 2018, Smithson failed his initial Ishihara test during his FRA recertification process and then also failed the Light Cannon—which the FRA has observed and approved. Because he failed to satisfy the FRA's color vision standards, Union Pacific was required to deny his FRA

recertification.

Nonetheless, Smithson now contends that Union Pacific discriminated against him in violation of the Americans with Disabilities Act ("ADA") by regarding him as disabled and wrongfully denying his FRA recertification. Smithson's remaining[1] disparate treatment claim fails because fails because: (1) he failed to exhaust the administrative remedies Congress made available through the FRA, which is a prerequisite to filing an ADA claim; and (2) because he lacks the FRA conductor certification required by federal law (and did not challenge the determination through the FRA administrative process), he cannot establish that he is a "qualified individual" under the ADA or that Union Pacific's actions were pretextual. Moreover, if the Court determines that Smithson's claim should survive summary judgment, he cannot demonstrate his entitlement to punitive damages. Union Pacific is thus entitled to summary judgment on Smithson's remaining disparate treatment claim.

## II. STATEMENT OF UNCONTESTED FACTS ("SOF")

### A. The Parties

1. Headquartered in Omaha, Nebraska and employing around 30,000 employees, Union Pacific is an interstate Class I freight railroad linking 23 states in the western two-thirds of the U.S. by rail. [Ex. A, Fields Decl., ¶¶ 4-5 (AOE 001-2).]

2. Union Pacific has an Equal Employment Opportunity and Affirmative Action Policy that prohibits discrimination, retaliation, and harassment on the basis of disability or any other protected status. [Ex. B (AOE 003-6); Ex. C, Pl. Dep., 35:17-37:14 (AOE 021-23).]

3. Smithson began working for Union Pacific in October 2006 as a conductor and worked in

[1] Because the Court dismissed Smithson's disparate impact and failure-to-accommodate claims, only his disparate treatment claim remains. (*See* this Court's May 11, 2022 Order, ECF No. 28.)

that position until March 2018. ECF No. 1, ¶ 24; [Ex. C, Pl. Dep., 19:15-19, 41:5-42:5 (AOE 012, 026-27).]

4. As a conductor, Smithson held a safety-sensitive position that is governed by the Federal Railroad Safety Act ("FRSA") and accompanying regulations implemented by the Federal Railroad Administration ("FRA")—both of which are binding on Union Pacific. [Ex. C, Pl. Dep., 21:8-22:7 (AOE 014-15); Ex. E (AOE 049-51).]. *See* 49 C.F.R. § 242.3(a).

5. A conductor is "the boss of the train" who is "making sure that everything gets to Point A to Point B as safely as possible and within the rules and regulations." Smithson primarily worked in two-person crews and assisted the locomotive engineer with train movement by telling the engineer the actual allowed train speeds, what was coming up from flags that were supposed to be displayed, handling radio communications with dispatch, and calling out colored wayside signals. [Ex. C, Pl. Dep., 19:20-21:7, 31:20-32:12 (AOE 012-13, 018-19); Ex. R (AOE 248-50).]

6. Locomotive engines weigh about 325,000 pounds and an average freight train is about a mile-and-a-half long. There are portions of track where speeds can get up to 60 miles per hour. Depending on weather conditions and the total weight of the train, it would take about ¾ of a mile to a mile for a freight train traveling at 60 miles per hour to stop once its brakes are applied. [Ex. C, Pl. Dep., 29:18-30:22 (AOE 016-17).]

7. The trains on which Smithson worked hauled hazardous and explosive materials, including nuclear waste, military missiles, and gasoline. He understood that an accident or derailment while hauling hazardous materials could be catastrophic. [Ex. C, Pl. Dep., 32:5-33:14 (AOE 019-20).]

8. Smithson understood that he was required to be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. [Ex. C, Pl. Dep., 31:2-17(AOE 018); Ex. E, p. 2 (AOE 050).]

**B. The Applicable FRA Regulations**

9. In 1999, the FRA promulgated Appendix F (Medical Standards Guidelines) to 49 C.F.R. Part 240 (Qualification and Certification of Locomotive Engineers). Its purpose was "to provide greater guidance on the procedures that should be employed in administering the vision and hearing requirements" for locomotive engineer certification and the appendix added "acceptable test methods for determining whether a person has the ability to recognize and distinguish among the colors used as signals in the railroad industry." The promulgation of Appendix F was in response to a railroad accident and NTSB investigation in Secaucus, New Jersey involving an engineer with a color vision deficiency. 49 C.F.R. Part 240 App. F; *Qualification & Certification of Locomotive Engineers*, 64 Fed. Reg. 60, 966, 60, 984 (Nov. 8, 1999). [Ex. O, Riley Dep., 13:5-17:17)) (AOE 209-13).]

10. In 2011, the FRA issued its final rule for conductor certification—requiring railroads to have a formal program for certifying conductors. The visual acuity requirements adopted for conductor certification were the same as for locomotive engineers. And Appendix D to 49 C.F.R. Part 242 was derived from Appendix F to Part 240 and addresses "acceptable test methods for determining whether a person has the ability to recognize and distinguish among the colors used as signals in the railroad industry." *Conductor Certification*, 76 Fed. Reg. 69,802, 69,822, 69,834 (Nov. 9, 2011); *compare* 49 C.F.R. § 240.121(c)(3) *with* § 242.117(h)(3); *compare* Part 240 App. F *with* Part 242 App. D. [Ex. O, Riley Dep., 33:4-34:2 (AOE 216-17).]

11. This was done to ensure anyone involved in train operations who could not meet the color vision acuity standards could not be certified to operate a train. [*See id.* 33:4-34:2 (AOE 216-17).]

12. The purpose of the FRA's regulations governing conductor certification is to ensure that only persons who meet minimum Federal safety standards serve as conductors, to reduce the rate

and number of accidents and incidents, and to improve railroad safety. [49 C.F.R. § 242.1(a)].

13. The FRA requires all conductors to meet certain color vision standards in order to be certified and recertified to hold that position. Conductors are required to pass a vision acuity examination during their certification and recertification process that tests their ability to recognize and distinguish between the colors of railroad signals. 9 C.F.R. §§ 242.109(a)(2), .117(b), (h)(3), Part. 242 App. D(2).

14. The FRA's regulations identify the 14-plate Ishihara test as an acceptable method for determining whether an individual has the requisite ability to recognize and distinguish between the colors used as signals in the railroad industry.[2] 49 C.F.R. Part 242 App. D(2).

15. If a conductor fails the Ishihara test, FRA regulations allow them, upon request, to be further evaluated by the railroad's medical examiner utilizing a color vision field test ("CVFT") to determine the individual's ability to safely perform as a conductor. 49 C.F.R. § 242.117(j), Part 242 App. D(4).

16. FRA regulations do not describe how a CVFT is to be conducted and give the railroad discretion to develop and implement a field test. *See id.*

17. The FRA has published best practices that provide minimal guidance on developing a CVFT. [Ex. F, *Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73,122 (Nov. 24, 2015) ("FRA Best Practices") (AOE 052-58).]

18. The intent of the FRA regulations is not to provide an individual with the right to make an infinite number of requests for further evaluation but to provide an individual with at least one

[2] The Ishihara test is "a widely used test for color blindness that consists of a set of plates covered with colored dots which the test subject views in order to find a number composed of dots of one color which a person with various defects of color vision will confuse with surrounding dots of color." MERRIAM-WEBSTER DICTIONARY *at* https://www.merriam-webster.com/medical/Ishihara%20test (last visited Feb. 24, 2026).

opportunity to prove that a vision test failure does not mean the individual cannot safely perform as a conductor. 49 C.F.R. Part 242 App. D(4).

19. A conductor who fails the Ishihara test and the secondary CVFT is not entitled to further medical evaluation regarding their color vision. *See id.*

**C. Union Pacific's Previous CVFT**

20. In 1999, Union Pacific implemented a CVFT in which an individual was presented with 10 wayside signal configurations in a preset order. The examiner noted the time it took for the individual to identify each signal and whether they identified each signal correctly. [Ex. G, pp. 29-30 (AOE 095-96).]

21. According to Smithson, the previous CVFT that he underwent at the SoSan (South San Antonio) yard consisted of a two-headed signal mast at the end of the yard that was just used for CVFT testing. He was instructed to call out the signal color instead of the meaning of the signal and one person operated the signal while another took notes on what Smithson called out. [Ex. C, Pl. Dep., 46:8-47:13 (AOE 30-31).]

**D. The 2012 Goodwell, Oklahoma Collision and NTSB Investigation**

22. In June 2012, two Union Pacific trains traveling in opposite directions collided head-on in Goodwell, Oklahoma—killing two engineers and one conductor and causing approximately $14.8 million in damage. The collision derailed five locomotives and 32 cars and several fuel tanks from the derailed locomotives ruptured, releasing diesel fuel that ignited and burned. [Ex. G, pp. 7, 10) (AOE 073, 076).]

23. After its investigation, the NTSB concluded that one of the probable causes of the collision was the eastbound train engineer's inability to see and correctly interpret the colored wayside signals. [Ex. G, p. 52 (AOE 118).]

24. The engineer had failed his Ishihara exam in 2009 but was granted his FRA recertification after passing Union Pacific's CVFT that had been in place since 1999. [*See id.,* pp. 29-30]. As Dr. Holland noted: "[P]art of the real problem with the initial color vision field test, the old one, is, if you do it on signal masts in the field, the employees know from the top, the middle, and the bottom. They can see at a distance of a quarter mile of where you're supposed to see the signal what the position is." [Ex. K, Dr. Holland Dep. (Apr. 22, 2022), 85:17-22 (AOE 184).]

25. After conducting its accident investigation and reviewing the CVFT taken by the eastbound engineer, the NTSB concluded Union Pacific's CVFT failed to ensure that its employees had adequate color vision acuity to work in safety-sensitive positions; and recommended that Union Pacific replace it. [Ex. G, p. 30 (AOE 096).]

**E. The FRA's 2015 Publications**

26. In March 2015, the FRA published a report affirming that normal color vision was necessary for certain railroad employees—even if the signals being interpreted were "completely redundant with regard to signal color and signal orientation." The report also concluded that railroad employees with color vision deficiencies "have a much higher relative error risk than employees with normal color vision (the relative risk of an error is nearly 8,000,000 times higher for individuals with defective color vision)" when interpreting redundant signals. [Ex. H, *Railroad Signal Color & Orientation: Effects of Color Blindness and Criteria for Color Vision Field Tests* (Mar. 2015), p. 8 (AOE 138).]

27. In November 2015, the FRA issued interim guidance in response to the Goodwell collision to clarify the vision testing and certification regulations and qualifications for conductors and engineers. [Ex. F (AOE 052-58); Ex. O, Riley Dep. 34:21-36:7 (AOE 217-19).]

28. As stated in the interim guidance, the "FRA's locomotive engineer and conductor

qualification and certification rules grant railroad medical examiners discretion in determining the methods and procedures the medical examiner will use to further evaluate persons who do not meet the vision thresholds [of the initial Ishihara exam] in 49 C.F.R. 240.121(c) and 242.117(h)." [Ex. F, p. 3 (AOE 054); Ex. O, Riley Dep., 50:13-51:6 ("As far as the follow-up, and field testing, that's based on the discretion of the railroad.") (AOE 223-24).]

29. With CVFTs, the FRA suggested they (1) be "valid, reliable, and comparable," (2) should "reasonably match actual operating or working conditions," and (3) may be performed while conductors stand "on the ground at distances from a signal or other object that the person must see and recognize to perform safely as a locomotive engineer or conductor." [Ex. F, pp. 5-6) (AOE 056-57).]

30. The FRA defined "validity, reliability, and comparability" as:

> *Validity* means the degree to which a test actually measures what the test is intended to measure. For example, a color vision field test is valid to the degree it assesses whether a person can recognize and distinguish between colors of the types of railroad signals in the yard or on all portions of railroad systems on which the person must perform safely, depending on the person's responsibilities. One way to estimate the validity of a test is to assess its degree of job-relatedness (content validity). The degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity.
>
> *Reliability* … means an examinee that is repeatedly administered the same test would demonstrate the same number of correct responses and missed signal responses each time the test is administered.
>
> *Comparability* means the testing procedures are fairly administered and the test results are uniformly recorded.

[Ex. F, p. 3 (AOE 054).]

31. The FRA included various best practices for railroads administering CVFTs including to: (1) standardize test procedures; (2) have a qualified supervisor conduct the test; (3) ensure the testing officer's vision meets the thresholds; (4) record test results during testing; (5) capture all

essential data and void tests with incomplete data; (6) have the test officer affirm that data was accurately recorded; and (7) before the test, inform the examinee of the test's purpose and procedures. [Ex. F, p. 5 (AOE 056); Ex. O, Riley Dep., 36:18-37:4 (AOE 219-20).]

32. Other specific recommendations included that the CVFT should not employ a predictable signal sequence and that each signal should be tested multiple times, both of which remove the likelihood of examinees passing with an educated guess. [Ex. F, p. 6 (AOE 057).]

**F. Union Pacific's Light Cannon CVFT**

33. In response to the NTSB's 2013 Goodwell report, Union Pacific began developing a revised CVFT for its locomotive engineers and conductors. [Ex. I, ¶ 5 (AOE 158).]

34. Union Pacific developed a new test signal device known as the "Light Cannon" to address the issues raised by the NTSB in its 2013 report and designed to reasonably match actual operating and working conditions for railroad workers responsible for identifying colored wayside signal lights as recommended by the FRA Best Practices. [Ex. I, Dr. Holland Decl., ¶ 7 (AOE 158); Ex. J, Doerr Dep., 103:3-23 (AOE 178); Ex. P, Dr. Ivan Dep., 59:12-17 (AOE 235) (explaining that Union Pacific sought to create a CVFT that "would be more representative of the wayside signal lights that were being put on the railroads now, namely LED-based ones.").]

35. In 2016, Union Pacific implemented a revised CVFT utilizing the Light Cannon and revised testing protocols to comply with the NTSB and FRA's recommendations. [Ex. I, Dr, Holland Decl., ¶¶ 6-7) (AOE 157).]

36. To administer the test, the Light Cannon was placed a quarter mile away from the examinee and (after verifying the device was working properly) the examinee was shown 20 separate signal lights for three seconds each. After viewing a signal for three seconds, the nurse administering the test would record the examinee's answer identifying the color of that signal light. [Ex. K, Dr.

Holland Dep. (Apr. 22, 2022), 195:7-19 (AOE 189).]

37. Union Pacific published procedures for the managers and occupational health nurses administering the Light Cannon. [Ex. Q (AOE 239-47).]

38. The Light Cannon complied with the FRA's suggested best practices by (1) using signals that are substantially like those being used in the field; (2) conducting the test at a distance that approximates the distance engineers and conductors need to be able to recognize signals; (3) removing positional cues (like those present in Union Pacific's former CVFT); and (4) presenting a proper number of individual signal lights to the examinee. [Ex. K, Dr. Holland Dep. (Apr. 22, 2022), 141:16-142:20 (AOE 185-86).]

39. In April 2016, Union Pacific began using the Light Cannon, since its medical team "agreed that it met FRA's criteria for validity, and we felt is was a very good test based on its content validity." *See id.* 145:8-10 (AOE 188).]

40. It was important to begin using the revised CVFT as soon as possible because it "provided a much better determination of employees with potential color vision defects that pose real safety risks for workers and the public." *See id.* 144:25-145:5 (AOE 187-88).]

41. Dr. Douglas Ivan, who helped design the Light Cannon test, testified that "someone with normal color vision should not have any trouble with the light cannon." [Ex. P, Dr. Ivan Dep., 117:18-20 (AOE 236).]

42. Indeed, Dr. Ivan's chief criticism of the initial version of the Light Cannon was that it may not have revealed all color-vision deficient individuals:

> [T]he concern functionally and safety-wise is to assess somebody's ability to see these signal lights correctly at the distances they are expected to do this.
>
> And even this first prototype, someone with normal color vision would have no trouble doing that. Somebody with defective color vision, that might employ these other cues, might be able to suggest that they can do the task, when, in fact, they

are at risk for not doing it correctly because they used these other aberrant cues.

*See id.* 120:11-20 (AOE 237).

43. After observing the Light Cannon and revised testing protocol, the FRA represented it complied with the NTSB's and FRA's color-vision-testing recommendations. [Ex. J, Doerr Dep., 97:21-98:17 (AOE177); Ex. O, Riley Dep., 52:5-55:1 (AOE 225-28).]

44. Around 2016, Joseph Riley, Specialist of Operating Crew Management in the FRA's operating practices division, learned about the Light Cannon and "saw nothing that would warrant a violation of anything." [Ex. O, Riley Dep., 22:15-19, 24:1-15, 47:2-48:1 (AOE 214, 215, 221-22).]

45. In 2017, the FRA concluded the Light Cannon field test was "an adequate field test as contemplated by 49 C.F.R. Part 240, Appendix F, paragraph (4)." [Ex. L, *In re Pendergraft*, FRA Docket EQAL-2017-13, p. 3][3]

46. In 2018, the FRA concluded the Light Cannon field test "was in accordance with 49 C.F.R. § 242.117 and 49 C.F.R. Part 242 Appendix D." [Ex. N, *In re Marlow*, FRA Docket FRA-2017-0049, p. 4 (AOE 204).]

47. In 2022, Union Pacific's retained expert, Steven Fender, observed the Light Cannon in use. Fender is a railroad transportation and safety consultant with 45 years of railroad industry experience, 31 years of which were at the FRA. Fender served as a principal advisor to the Associate Administrator for Railroad Safety and often represented FRA on regional and national transportation, safety, and security issues. [Ex. GG, Declaration of Steven J. Fender, ¶¶ 2, 4-5

[3] The *Pendergraft* decision evaluated the Light Cannon administered to Pendergraft in September 2016—which is the same CVFT administered to Smithson in March 2018. [Ex. I, Dr. Holland Decl., ¶ 6 (noting the Light Cannon was not altered between its implementation and March 2018) (AOE 158).; Ex. M (AOE 196-200).]

(AOE 327-30); Ex. HH, pp. 1-4, 7-8 (AOE 333-34).]

48. Fender found the Light Cannon to be "reasonable and quite effective" and "remarkably similar to reproduction of signal previews as seen from a locomotive." It is his professional view that the Light Cannon "is in compliance with the FRA's Engineer and Conductor Certification Rules, and specifically, the 2015 guidance offered in the [FRA Best Practices]." Finally, Fender stated, "The Light Cannon field test is a practical, well-developed, and implemented test which replicates real world conditions that train crews encounter on the various railroads, routes, and line segments." [Ex. HH, p. 8 (AOE 334).]

**G. Smithson's Failed Color Vision Exams in 2018**

49. As part of his preemployment medical evaluation with Union Pacific, Smithson completed a health history form. The form asked whether Smithson had color vision weakness or deficiency and he checked "yes." Smithson then handwrote an explanation: "Eye vision (Ishahara [sic] test) have had some problems with this type of test but other test for color never had a problem with." [Ex. C, Pl. Dep., 37:17-39:25 (AOE 023-25); Ex. S, pp. 5, 7 (AOE 255, 257).]

50. Smithson was explaining that he had learned that he had trouble passing the Ishihara test earlier in his career when attempting to work in law enforcement. [Ex. C, Pl. Dep., 14:25-16:2, 39:9-25 (AOE 009-11, 025).]

51. Smithson failed the Ishihara test in 2006, 2010, and 2015 but passed Union Pacific's previous version of the CVFT. [ECF No. 1, ¶¶ 26-27; [Ex. C, Pl. Dep., 42:6-25, 43:15-24, 45:8-48:17, 49:21-25, 50:16-52:14 (AOE 027-28, 029-30, 033, 034-35); Ex. D (AOE 048); Ex. T (AOE 269); Ex. U (AOE 260).]

52. On March 7, 2018, Smithson underwent vision screening for his FRA recertification and took the Ishihara test. Smithson again failed the test, missing seven of 14 plates.

He was removed from service as a conductor and required to take a CVFT, which was the Light Cannon. [ECF No. 1, ¶ 28; Ex. C, Pl. Dep., 52:17-53:22 (AOE 036-37); Ex. I, Dr. Holland Decl., ¶ 9 (AOE 159); Ex. V (AOE 261).]

53. On March 28, 2018, Union Pacific administered the Light Cannon test to Smithson. He failed the test, missing three of the 20 signals presented. [ECF No. 1, ¶ 29; Ex. C, Pl. Dep., 60:24-61:22, 66:5-67:7 (AOE 039-40, 041-42); Ex. I, Dr. Holland Decl., ¶ 9 (AOE 159); Ex. W, Smithson 2018 CVFT (AOE 262-63).]

54. Union Pacific's Chief Medical Officer, Dr. John Holland, reviewed the results of Smithson's failed Ishihara test and Light Cannon CVFT. Based on his review of these test results, Dr. Holland determined that Smithson did not meet the color vision requirements for FRA recertification as a conductor. Accordingly, Dr. Holland issued permanent restrictions prohibiting Smithson from doing "job tasks which require accurate identification of colored railroad wayside signals." [Ex I, Dr. Holland Decl., ¶ 9 (AOE 159); Ex. X (AOE 264).]

55. On April 2, 2018, Dr. Holland issued a Notice of Pending Denial of FRA Certification based on Smithson's failure to meet the FRA vision standards. The notice explained the Smithson's FRA certification as a railroad conductor was pending denial because his "vision examination results indicate[d] you failed to meet the required thresholds for vision pursuant to 49 C.F.R. § 240.207 and/or 49 C.F.R. § 242.117 and the associated regulatory testing guidelines." [Ex. C, Pl. Dep, 67:10-68:4 (AOE 042-43); Ex. I, Dr. Holland Decl., ¶ 10 (AOE 159); Ex. Y (AOE 265).]

56. Smithson submitted a letter to Union Pacific objecting to his CVFT results because there had been rain and lightning right before his test. He also had concerns that there was traffic flow interrupting the test. But Smithson acknowledges that it was partly cloudy, the sun was out at the time of his CVFT, and that traffic flow did not interfere with his ability to see the signal lights.

[Ex. C, Pl. Dep., 58:5-19, 61:12-17, 71:2-10 (AOE 038, 040, 044); Ex. Z (AOE 266-67).]

57. Union Pacific sent Smithson's FRA recertification exam materials from 2015 and 2018, along with an eye examination conducted by Smithson's personal optometrist, to Dr. Ivan to conduct a medical file review. Dr. Ivan is a board-certified ophthalmologist, with extensive experience in working in color vision for U.S. Air Force pilots, who served as a consultant for Union Pacific on vision issues. [Ex. BB, p. 1 (AOE 280).]

58. Dr. Ivan's June 26, 2018 report to Dr. Holland confirmed that Smithson most likely had a "long-standing underlying congenital red/green color vision disorder." [Ex. AA, Dr. Holland Dep. (Oct. 18, 2022), 50:6-51:23 (AOE 271-72); Ex. BB, p. 3(AOE 278).]

59. Dr. Ivan recommended as follows:

> If UPRR/HMS is considering Mr. Smithson for a return to duty into a job classification that requires reliable and accurate color vision performance across all possible operational conditions, definitive color vision testing could be considered to confirm the type and degree of any existing color vision deficit as part of his FFD determination. If performed, such testing should be accomplished using the gold standard test for congenital red/green color vision, namely a Rayleigh equation-based anomaloscope. In the absence of access to an anomaloscope, one of the following new computerized color vision tests could be substituted: *Rabin Cone Contrast Test (CCT)* by *Innova*, a later version of that test known as the *ColorDx CCT-HD* produced by *Konan Medical*, the *Waggoner Computerized Color Vision Test (CCVT)*, or the *Color Assessment & Diagnosis (CAD) Test* by *City Occupational Ltd*. [Ex. BB, p. 3 (AOE 280).]

60. Union Pacific then referred Smithson to Dr. Jeffrey Rabin to conduct the additional color vision testing recommended by Dr. Ivan. Dr. Rabin is a Professor, Assistant Dean of Graduate Studies, and Chief of Visual Neurophysiology Service at University of the Incarnate Word Rosenberg School of Optometry in San Antonio, Texas. [Ex. AA, Dr. Holland Dep. (Oct. 18, 2022), 51:24-52:2 (AOE 272-73); Ex. CC, p. 3 (AOE 284).]

61. In his August 8, 2018 report to Dr. Holland, Dr. Rabin stated that he had conducted a comprehensive color vision evaluation on Smithson. This included Smithson failing an Ishihara

test, scoring 9/14 correct on the Dvorine test,[4] and twice failing the Stereo-Optical OPTEC 900 signal light test.[5] Dr. Rabin also used an anomaloscope, which confirmed a moderate hereditary protanomalous (red-weak) color vision deficiency. Finally, various computer-based cone contrast testing revealed "a more severe protanomalous defect." [Ex. CC, pp. 1-2 (AOE 282-83).]

62. Dr. Ivan then reviewed Dr. Rabin's report and prepared an addendum report to Dr. Holland dated August 23, 2018. Based on Dr. Rabin's testing, Dr. Ivan stated:

> Based on all these test reports, Mr. Smithson clearly has a congenital red/green color vision disorder initially suspected by his inability to pass the Ishihara PIP test. Definitive testing with the anomaloscope verified a defect and classified it as a moderate protanomalous color vision abnormality. Several new computer-based tests approaching the anomaloscope in accuracy also identified a significant defect in his red cones, but also a green cone issue in the left eye as well.[Ex. DD, pp. 1-3 (AOE 301-3).]

63. After reviewing the reports from Drs. Ivan and Rabin, Dr. Holland "reconfirm[ed] the determination that Mr. Smithson cannot adequately identify colors of railway train signals" and "he does not meet vision criteria for FRA certification." [Ex. I, Dr. Holland Decl., ¶ 11 (AOE 160); Ex. EE (AOE 305-7).]

64. On September 11, 2018, Dr. Holland issued Smithson a Notification of FRA Certification Denial, which again notified him that his FRA certification as a conductor was denied for failing to meet the vision standards under 49 C.F.R. § 242.117. [Ex. C, Pl. Dep., 78:1-6 (AOE 045); Ex. I, Dr. Holland Decl., ¶ 12 (AOE 160); Ex. FF (AOE 308).]

65. In 2018, any conductor who was denied recertification by a railroad had 120 days following the denial to file a petition asking the FRA to review the railroad's decision. The FRA delegated

---

[4] Making three or more errors on the Dvorine test is a failure under the FRA's medical standards. *See* 49 C.F.R. Part 242 App. D(2).

[5] Smithson's own expert witness, Dr. Jay Neitz, acknowledges that the OPTEC 900 "reduces risk of passing those who might make errors with signal lights." [Ex. II, Dr. Neitz Dep., 26:23-27:11 (AOE 338-39).]

initial responsibility for adjudicating these disputes to the Operating Crew Review Board ("OCRB"). 49 C.F.R. §§ 242.501, .503 (2012). [Ex. O, Riley Dep., 65:4-66:8 (AOE 229-30); Ex. JJ, McClelland Decl., ¶¶ 4-6 (AOE 341).]

66. Smithson did not appeal the denial of his FRA certification to the FRA. [Ex. C, Pl. Dep., 78:7-9 (AOE 045); Ex. JJ, McClelland Decl., ¶¶ 7-8 (AOE 342).]

## III. <u>ARGUMENT AND AUTHORITIES</u>[6]

### A. Smithson Failed to Exhaust His Administrative Remedies Through the FRA.

Union Pacific is entitled to summary judgment because Smithson never pursued the administrative remedies Congress made available through the FRA to challenge the denial of his conductor recertification. Although styled as ADA claims, Smithson's claims arise from his inability to satisfy the FRA's color vision standards—a prerequisite for conductor certification. 49 C.F.R. § 242.117(h)(3); Part 242 App'x D; 49 C.F.R. § 242.109(a)(2). Administrative exhaustion is required where, as here, an employment action is based on the failure to satisfy safety standards established by federal regulation. *See Turner v. BNSF Railway Co.*, 138 F.4th 224, 232 (5th Cir. 2025); *Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 638 (8th Cir. 2003). The FRA provides a process to challenge a railroad's certification determination, which Smithson did not utilize.

#### 1. Administrative exhaustion is required when employee fitness falls squarely within the regulatory scheme and substantive expertise of the FRA.

"There is a 'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Harris*, 339 F.3d at 638 (quoting *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 50–51 (1938)). Courts apply this rule even where a plaintiff asserts claims under the ADA. *Id.*;

---

[6] Union Pacific incorporates the summary judgment standard in *Roby v. Frontier Enters., Inc.*, No. SA–11–CV–368–XR, 2012 WL 4321312, at *1 (W.D. Tex. Sept. 19, 2012).

*Turner,* 138 F. 4th at 232; *Cromeens v. Union Pac. R.R. Co.*, 805 F. Supp. 3d 1062, 1070-72 (D. Neb. 2025). Applicable safety requirements promulgated by federal agencies "limit application of the ADA as a matter of law." *Harris*, 339 F.3d at 639 (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999)). Further, exhaustion allows an agency to "bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *INS v. Ventura*, 537 U.S. 12, 17 (2002).

In the context of "promot[ing] safety in every area of railroad operations," Congress mandated that the Secretary of Transportation prescribe regulations related to licensing or certification of "any operator of a locomotive." 49 U.S.C. § 20135(a); 49 U.S.C. § 20101; *see also Lane v. R.A. Sims, Jr.*, 241 F.3d 439, 442 (5th Cir. 2001) ("It authorizes the Secretary of Transportation to 'prescribe regulations and issue orders for every area of railroad safety []' and provides that '[l]aws, regulations, and orders *related to railroad safety* shall be *nationally uniform* to the extent practicable.'") (quoting 49 U.S.C. §§ 20103(a), 20106) (emphasis in original and internal citation omitted). As part of that mandate, Congress also required that "an individual denied a license or certification […] shall be entitled to a hearing under section 20103(e) […] to decide whether the license has been properly denied." 49 U.S.C. § 20135(d). To comply with § 20135, the FRA has set forth an appeals process by which individuals seeking conductor certification like Smithson can seek review of a railroad's decision to deny certification or recertification. *See* 49 C.F.R. §§ 242.501, *et seq.*

In a virtually identical case, the Fifth Circuit recently summarized the FRA's administrative review process:

> The appeals process has three layers of review. First, the FRA's Operating Crew Review Board (OCRB) reviews the denial. 49 C.F.R. Part 240.401(b), 242.501(b).

> It considers (1) whether the railroad's finding was supported by substantial evidence; (2) whether the railroad failed to follow proper procedures causing substantial harm; and (3) whether the railroad made correct legal interpretations. 49 C.F.R. §§ 240.405(h)–(j), 242.505(h)–(j). If the OCRB affirms the railway's decision, the applicant can appeal the decision yet again, to a presiding officer who considers all relevant facts and determines the correct application of Part 240 or 242 to the circumstances presented. 49 C.F.R. §§ 240.409(c), 242.509(c). Finally, if the presiding officer affirms, the applicant can appeal to the FRA Administrator. 49 C.F.R. §§ 240.411(e), 242.511(e). "The Administrator may remand, vacate, affirm, reverse, alter, or modify the decision of the presiding officer..." *Id.*

*Turner*, 138 F.4th at 230-231 (holding that a conductor, like Smithson, failed to exhaust his administrative remedies through the FRA and, as a result, was not a "qualified individual" under the ADA); *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 261 (8th Cir. 1996) (recognizing that the FRA's regulations include "a specific, detailed scheme setting out dispute resolution procedures"); *Weeks v. Union Pac. R.R. Co*., No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123, at *7 (E.D. Cal. May 3, 2017).[7]

In short, the FRA, by mandate of Congress, offers conductors like Smithson three steps for challenging a railroad's decision to deny recertification. A court cannot reach a conductor's ADA claims unless and until the question of their physical qualification is resolved pursuant to FRA procedures.

**2. <u>Indisputably, Smithson did not even attempt the FRA administrative review process</u>.**

Here, it is undisputed that Smithson failed to obtain his required FRA recertification after

[7] And, as the Fifth Circuit noted, even after the three-step review process, the Hobbs Act, 28 U.S.C. § 2342(7), gives the courts of appeals exclusive jurisdiction to review "all final agency actions," including actions related to the certification of locomotive conductors. *Turner*, 138 F.4th at 231; 49 U.S.C. § 20114(c). To obtain the relief he seeks, Smithson must challenge the FRA's interpretation of its regulations and Union Pacific's application of them. Allowing this suit to proceed would circumvent the exclusive review Congress reserved to the Fifth Circuit through the Hobbs Act.

failing the Ishihara test and Union Pacific's CVFT. [SOF ¶¶ 52-64.] It is further undisputed that Smithson did not take any steps to exhaust his administrative remedies to appeal this decision under the FRA. [SOF ¶¶ 65-66.]

This court need not look far for on-point guidance on resolving Smithson's claims. The Fifth Circuit in *Turner* has held that disagreements over federally regulated certifications fall squarely within the province of the statutorily mandated administrative review procedures. *Turner,* and even other courts have analyzed the exact administrative review process available to Smithson and held that exhaustion through the FRA was required before filing suit. Indeed, *Turner* examined the exact same conductor certification requirements and administrative review process at issue here. *See* 138 F.4th 224. The Fifth Circuit held that "any disagreement Turner has with BNSF's decision not to certify him as a conductor is under the purview of the FRA. But Turner never gave the FRA a chance to have a final say on whether he should be certified." *Id*. at 230. The court dismissed the case because Turner failed to exhaust his administrative remedies through the FRA and was therefore not a "qualified individual" under the ADA. *Id*. at 232.

Like Smithson, Turner failed both the Ishihara (14-plate) test and the railroad's secondary color vision field test. *Id*. at 227. Because Turner failed both tests and the medical examiner did not determine he could nevertheless safely conduct trains, BNSF denied recertification. *Id*. The facts are materially indistinguishable from Smithson's situation.

The Fifth Circuit emphasized that "[b]y law, BNSF could not employ Turner because he did not obtain the FRA-required certification according to its implementation of the substantive and procedural requirements promulgated by FRA regulations." *Id*. at 231. "If Turner believes that he deserves certification despite BNSF's efforts to comply with the rules, he must go to the font of that decision-and rule-making authority: the FRA." *Id*. The court further explained:

> This exhaustion requirement is especially important if a plaintiff alleges that a federal regulation, or a private party's administration of it, might violate a nondiscrimination statute like the ADA, as Turner does here. Without an exhaustion requirement, "employers would face the dilemma of risking ADA liability or violating the [agency's] command that" employees, like drivers of motor carriers, must be "qualified under the agency's safety regulations." After all, the agencies have "greater expertise in applying [their] [] certification regulations." We refuse to force employers into a choice between the rock of ADA liability and the hard place of regulatory violation.

*Id*. (internal citations omitted).

**This case is indistinguishable from *Turner***. The Fifth Circuit cited *Harris* approvingly, and both cases relied on the Supreme Court's holding in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999) ("[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law."). *Turner's* analysis compels the conclusion that Smithson failed to exhaust his administrative remedies, entitling Union Pacific to summary judgment.

**B. Nonetheless, Smithson's Disparate Treatment Claim Still Fails as a Matter of Law.**

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff can prove intentional discrimination under the ADA by presenting direct or circumstantial evidence. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (brackets in original and quotation omitted). To meet the direct evidence standard, Smithson must do more than just showcase differing medical opinions. Evidence on an employer's "subjective intent to discriminate" is "required in a 'disparate-treatment case.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003). The Fifth Circuit also recognizes that disparate-treatment claims require "proof and finding of discriminatory motive." *Cicalese v. Univ.*

*of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (quotation omitted). Here, Smithson cannot meet his burden under either evidentiary framework.

**1. <u>Smithson Does Not Have Direct Evidence of Discrimination</u>.**

"[D]irect evidence is rare." *Clark*, 952 F.3d at 579 (alternation in original and quotation omitted). Direct evidence is evidence that, "if believed, it proves the fact of 'discriminatory animus without inference or presumption.'"); *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (quoting *Rodriguez v. Eli Lily & Co.*, 820 F.3d 759, 765 (5th Cir. 2016)). "If an inference is required for the evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019).

Here, Smithson was denied FRA recertification and removed from service because he failed the Light Cannon after failing his initial Ishihara test. [SOF ¶¶ 52-64.] Concluding that Smithson was ineligible to be recertified under binding FRA regulations is not the same as removing him from service because of discriminatory animus. Unlike other employment discrimination laws, the ADA recognizes that an employee's medical condition may be relevant to job qualifications. Thus, the ADA expressly allows employers to conduct job-related medical examinations and inquiries, negating any conclusion that this action can be direct evidence of discrimination. *See* 42 U.S.C. § 12112(d)(4); *see, e.g., Hinojosa v. Jostens Inc.*, 128 Fed. App'x. 364, 368 (5th Cir. 2005) ("In fact, the ADA authorizes employers to inquire about an employee's ability to perform job-related functions.") (citing 42 U.S.C. § 12112(d)(4)(B)); *Ketcher v. Wal-Mart Stores, Inc.*, 122 F. Supp. 2d 747, 754 (S.D. Tex. 2000) (citation omitted); *Trevillion v. Union Pac. R.R.*, No. 18-610, 2021 WL 1762112, at *5 (W.D. La., May 4, 2021); *see also* 29 C.F.R. § 1630.14(c). Other courts have agreed that such is not direct evidence of discrimination. *See Kitchen v. BASF,* 952 F.3d 247, 252 (5th Cir. 2020) (holding that firing the plaintiff based on the results of

his breath alcohol test "is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics" because an inferential leap would be required to arrive at that conclusion); *see also Polak v. Sterilite Corp.,* No. 3:19-CV-2972-D, 2021 WL 1753757, at *4 (N.D. Tex. May 4, 2021), *aff'd*, No. 21-10549, 2022 WL 457822 (5th Cir. Feb. 15, 2022; *Bibbs v. Motiva Enters. LLC*, No. 1:23-CV-00315, 2024 WL 5088130 (E.D. Tex. Nov. 20, 2024). Thus, Smithson has not produced direct evidence of discrimination to support his claim.

**2. Smithson Cannot Meet His Burden with Indirect Evidence Either.**

To establish a *prima facie* case of discrimination, Smithson must show that he (1) is disabled under the ADA; (2) is qualified, with or without reasonable accommodation to perform his job's essential functions; and (3) suffered an adverse employment action because of his disability. *Clark*, 952 F.3d at 582. If Smithson makes a *prima facie* case, the burden shifts to Union Pacific to articulate a legitimate, nondiscriminatory reason for its actions. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Union Pacific's burden "is one of production, not proof, and involves no credibility assessments." *Harris v. Dallas Cnty. Hosp. Dist.*, No. 3:14-CV-3663-D, 2016 WL 2914847, at *10 (N.D. Tex. May 19, 2016). The burden then shifts back to Smithson to show that Union Pacific's stated reasons are pretext designed to mask discrimination. *Id*. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at *10 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000)).

**a. Smithson was not qualified under the ADA because he could not satisfy the FRA's mandatory color vision standard for recertification and he failed to appeal through the FRA.**

A "qualified individual" under the ADA is one "who, with or without, reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *see*

*also* 42 U.S.C. § 12111(8); *Gober v. Frankel Family Trust*, 537 Fed. App'x. 518, 521 (5th Cir. 2013). A qualified individual is one who (1) "satisfies the requisite skills, experience, education and other job-related requirements" of the position; *and* (2) "who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *Gonzales v. City of New Braunfels*, 176 F.3d 834, 837 (5th Cir. 1999).

As an initial matter, Smithson only pleads that Union Pacific "regarded" him as disabled. ECF No. 1, ¶ 42. Thus, Union Pacific had no duty to accommodate his medical restrictions so he could continue working as a conductor: "[T]he duty to make reasonable accommodation arises only when the individual is actually disabled; no such duty arises when the individual is merely regarded as being disabled [under] the ADA." *Cannizaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 475 (N.D. Tex. 1997) (quotation omitted); *see Trautman v. Time Warner Cable Tex., LLC*, No. A-16-CV-1049-LY, 2017 WL 5985573, at *12 n. 2 (W.D. Tex. Dec. 1, 2017) ("Employers have no duty to accommodate employees only 'regarded as' having a disability.").

To prove he is qualified, Smithson must therefore show he can perform his essential job functions **without** accommodation. This he cannot do because he cannot demonstrate he was qualified for his position because he failed to obtain his required FRA recertification after failing the Ishihara test and Union Pacific's CVFT. [SOF ¶¶ 52-64.]

In *Turner, supra,* the Fifth Circuit agreed. Again, like Smithson, the conductor in *Turner* failed the Ishihara 14-plate test and BNSF's secondary CVFT. *Id.* at 227. Thus, BNSF's medical examiner did not determine he could safely perform his job despite failing these tests, BNSF refused to grant the conductor an FRA certification. *Id.* Further, Turner (like Smithson) did not appeal the denial through the FRA's administrative review. *Id.* The *Turner* court, relying its precedent and cases from other circuits, held:

> In *Williams v. J.B. Hunt Transport*, 826 F.3d 806, 811 (5th Cir. 2016), we described our exhaustion requirement's support from two sister circuits. Both "have rejected commercial drivers' ADA claims when ... a doctor found the plaintiff medically unqualified [as required by federal regulations] and the plaintiff did not obtain a contrary opinion through the DOT's administrative process." 826 F.3d at 811. *See Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 638–39 (8th Cir. 2003); King v. Mrs. Grissom's Salads, Inc., No. 98-5258, 1999 WL 552512, at *3 (6th Cir. 1999). Here as in *Williams*, and other circuits, **failure to receive a certification required by federal law, and the failure to exhaust administrative remedies related to that certification, means the plaintiff, here Turner, cannot show he is a "qualified individual" under the ADA**.

*Id.* at 232 (emphasis added); *see also Zaragoza v. Union Pacific R.R. Co.,* Case No. EP-21-CV-287-KC (W.D. Tex. Oct. 31, 2025) (relying on *Turner,* granting summary judgment for Union Pacific on ADA claims of conductor who, like Smithson, was denied recertification due to failing the CVFT)[8]; *Cromeens,* 805 F. Supp. 3d at 1070-72. Smithson is thus unable as a matter of law to establish he is a "qualified individual" under the ADA which is fatal to his claim.

**b. <u>Smithson's attempts to challenge the Light Cannon test are immaterial and, in any event, fail</u>.**

Smithson contests the denial of his FRA recertification by claiming the Light Cannon was not properly validated and did not accurately measure his ability to see and interpret colored railroad signals. His argument is meritless. Indeed, the Eighth Circuit has already addressed—and rejected—Smithson's argument:

> It is undisputed the [FRA] regulations do not describe how the field test is to be conducted but rather, state that the railroad may exercise its discretion to conduct the [color vision] field test in a manner of its choosing in conjunction with its medical advisor. There is no prescribed methodology for the manner in which a filed [sic] test is to be conducted.

*Brunskill v. Kansas City S. Ry. Co.*, No. 06-00205-CV-W-REL, 2008 WL 413281 at *29 (W.D. Mo. Feb. 12, 2008), *aff'd*, 331 Fed. App'x. 426, 2009 WL 2448265 (8th Cir. 2009). There, because

[8] A true and correct copy of the District Court's decision in *Zaragoza* is attached to the AOE as Ex. KK (AOE 343-48).

the railroad's chief medical officer believed the CVFT administered to the plaintiff was an appropriate method for measuring his color vision under FRA, the court deemed this sufficient to rebut the plaintiff's ADA discrimination claim. *Id.*; *see also Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 686-87 (W.D. Tenn. 2001).

Like *Brunskill*, Smithson's belief that the Light Cannon was not the most effective way to test his color vision is immaterial. Smithson and his expert assert that Union Pacific should have used a different field test or should have had the Light Cannon scientifically validated. Importantly, the FRA regulations do not require Union Pacific to use any of the alternative tests Smithson's expert suggests. Nor do the FRA regulations require a field test be scientifically validated. The FRA never imposed any "validation" requirement under its best practices—which it describes as merely suggestions:

> The following best practices are intended to guide each railroad in designing, implementing, and scoring color vision field testing for locomotive engineer and conductor certification. They are broadly drafted to allow each railroad to develop field testing procedures that will work for its own operational environment and to consider the unique medical circumstances of each examinee tested. Furthermore, these best practices will guide railroads to establish best testing practices. Of course, FRA recognizes and appreciates that some railroads already follow many of these best practices, and will readily adopt additional best practices that are viewed as making the field test more valid, reliable, and comparable. FRA encourages each railroad to consider adopting all best practices.

*See* AOE 056, Ex. F at p. 5. Per the FRA Best Practices, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." [SOF ¶ 30.] CVFTs should "reasonably match actual operating or working conditions" and may be performed while conductors stand "on the ground at distances from a signal or other object that the person must see and recognize to perform safely as a locomotive engineer or conductor." [SOF ¶ 29.] Other recommendations include not employing a predictable signal sequence and testing each signal multiple times to remove the likelihood of passing with an educated guess. [SOF ¶ 32.]

FRA regulations provide that Union Pacific may use a "field test" as opposed to a "scientific screening test" as the "further medical evaluation" to determine if an individual meets the FRA color vision standards. 49 C.F.R. Part 242 App. D(4); *see* Exh. F (AOE 054) (80 Fed. Reg. 73,122, at 73,124) (distinguishing between a "practical test," (aka a "field test" in the railroad community), which is "performed outdoors under test conditions that reasonably match actual operating or working conditions" and a "scientific test" which requires "a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication"). The FRA has repeatedly referred to the Light Cannon test as a "field test." [SOF ¶ 45.]

Union Pacific's Light Cannon meets the FRA suggestions regarding CVFTs. According to the FRA, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." [SOF ¶ 31.] The Light Cannon test met the suggested criteria by (1) using signals that were substantially like those being used in the field; (2) conducting the test at a distance that approximates the distance conductors need to be able to recognize signals; (3) removing positional cues (like those present in the previous CVFT); (4) showing a proper number of individual signal lights to the examinee; and (5) used standardized testing protocols to ensure reliability and comparability. *Compare* SOF ¶¶ 30-33 *with* SOF ¶¶ 37-38.

The record also shows that Union Pacific worked extensively to ensure that the Light Cannon reasonably matched actual conditions. After Drs. Ivan and Rabin prepared a report recommending changes to a prototype of the Light Cannon that was never used, Dr. Ivan testified about the work that went into the second evaluation process following the report—stating he "[saw] all of that as validation" and believed the Light Cannon "was representative of what was being used on the lines." [SOF ¶ 34.]

More importantly, the FRA has expressly concluded that the Light Cannon meets its

standards for a valid field test. FRA safety administrators came on site at Union Pacific, evaluated the CVFT in person, and raised no objection to its use. [SOF ¶¶ 44, 47-48.] The Locomotive Engineer Review Board ("LERB"), which is responsible for reviewing petitions from locomotive engineers appealing a railroad's decision to deny certification for not meeting the color vision standards,[9] has also explicitly held that the Light Cannon is a valid field test as contemplated by the FRA regulations.

> Petitioner first asserts that the "light cannon" color vision test is an improper field test, because his 12 years of experience operating a train and medical finding of a "very mild" red/green color vision deficiency demonstrate he can safely operate a locomotive. The Board disagrees. Based on the materials submitted by both Petitioner and UP, the Board finds that the "light cannon" field test is an adequate field test as contemplated by 49 C.F.R. Part 240, Appendix F, paragraph (4).

[SOF ¶ 45; *see also* SOF ¶ 46.].

Lastly, Smithson's years of prior employment as a conductor and passage of the previous CVFT are immaterial. These arguments directly contradict the FRA's color vision acuity requirements. Indeed, the Goodwell collision and the NTSB and FRA responses illuminate the danger in this argument. *See, e.g., Bey v. City of N.Y.*, 999 F.3d 157, 161-62, 168 (2d Cir. 2021) (holding that fire department was not obligated to continue permitting firefighters to wear closely cropped beards because it felt that doing so was not permitted by OSHA regulations). Smithson failed to satisfy the FRA's color vision standards necessary for recertification as a conductor. He was not "qualified" under the ADA and his disparate-treatment claim fails as a matter of law.

**c. <u>Regardless, Union Pacific had legitimate, non-discriminatory reasons for its actions and Smithson cannot prove pretext</u>.**

Even if Smithson could establish a *prima facie* case of discrimination under the ADA—

[9] Locomotive engineers and conductors must pass the same tests to meet the FRA standards and Union Pacific uses the same Light Cannon for both. *Compare* 49 C.F.R. Part 240 App. F, *with* 49 C.F.R. Part 242 App. D; *see also* SOF ¶¶ 9-10.

which he cannot— he must also prove Union Pacific's discriminatory intent, i.e., pretext designed to mask discrimination. *See, e.g., Raytheon Co.*, 540 U.S. at 52-55; *Mosley v. Bexar Cnty.*, No. SA-17-CV-00583-XR, 2020 WL 589540, at *16 (W.D. Tex. Feb. 5, 2020). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Sears v. Zions Bancorporation NA,* No. 21-10448, 2022 WL 1800779, at *3 (5th Cir. June 2, 2022) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). A plaintiff's "subjective beliefs" of alleged discriminatory intent cannot create a genuine fact dispute regarding pretext. *Best v. UTI Logistics*, No. G:06-0300, 2008 WL 62210, at *4 (S.D. Tex. Jan. 3, 2008). "Courts are not permitted to second guess an employer's business decision when conducting pretext analysis." *Wilson v. L&B Realty Advisors, LLP*, No. 3:20-CV-2059-G, 2022 WL 102564, at *14 (N.D. Tex. Jan. 11, 2022).

Here, Union Pacific denied Smithson's FRA recertification and issued restrictions for one reason—to comply with FRA safety regulations. Smithson understood this and was subjected to the same FRA-mandated color vision testing as every other conductor who works for Union Pacific. Because Smithson failed his Ishihara test and Union Pacific's CVFT, Union Pacific was unable to recertify him as a conductor in accordance with FRA regulations and could not return him to his conductor position. Indeed, Union Pacific told Smithson that his FRA recertification was denied for failing to meet the FRA's vision standards. [SOF ¶¶ 55, 64.] Adhering to the FRA's binding regulations regarding the color-vision standards for conductors was a legitimate, non-discriminatory reason for not returning Smithson to service. And Smithson presents no evidence demonstrating this good-faith adherence to federally mandated regulations was pretext for intentional discrimination. *See, e.g., Vaughn v. FedEx Freight, Inc.*, 421 F. Supp. 3d 1302, 1310-12 (N.D. Ala. 2019) (employer's reliance on applicable FMCSA medical guidelines was a

legitimate, non-discriminatory reason for disqualifying driver); *Sharbono v. N. States Power Co.*, 218 F. Supp. 3d 1004, 1019 (D. Minn. 2016) (no pretext for disability discrimination where employee was unable to comply with safety-footwear requirements of OSHA policy).

Thus, the Court should grant summary judgment in Union Pacific's favor.

**C. Smithson's Punitive Damages Claim Also Fails.**

"A claimant asserting a private cause of action for violations of the ADA [] may only recover punitive damages … if she can show that [Defendant] acted with malice or with reckless indifference to her federally protected rights." *Rizzo v. Blues Mgmt., Inc.*, No. 4:16-cv-01017, 2017 WL 549016, at *4 (S.D. Texas, January 24, 2017) (quoting 42 U.S.C. § 1981a(b)(1)); *Williams v. Trader Pub. Co.*, 218 F.3d 481, 487-88 (5th Cir. 2000). This heightened standard mirrors that in *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 533, 535 (1999). Thus, a plaintiff must prove their employer engaged in intentional discrimination **and** that they did so with malice or "in the face of" a perceived risk that its actions would violate federal law to justify a punitive damages award. *Id*. at 536. "There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard." *Id*. at 536-37.

Smithson has no facts to suggest that Union Pacific intentionally discriminated against him with malice or reckless disregard to his rights. Indeed, Union Pacific was **required** to remove him from service and determine if his color vision met the FRA recertification standards. Because Union Pacific had to deny FRA recertification when Smithson failed his CVFT, this does not amount to "malice or reckless indifference" toward Smithson's rights, Union Pacific is entitled to summary judgment on his punitive damages claim. *See Barrett v. Union Pac. R.R. Co.*, No. 19-cv-06377-CV, 2021 WL 233129, at *1 (N.D. Cal. Jan. 25, 2021) (granting summary judgment to Union Pacific on plaintiff's punitive damages claim).

## III. CONCLUSION

For these reasons, the Court should grant Union Pacific summary judgment on Smithson's remaining claim of disparate treatment under the ADA (Count I).

Respectfully submitted this 27th day of February, 2026,

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

*/s/ Lara C. de Leon*
Lara C. de Leon (TX #24006957)
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (512) 382-8800
ldeleon@constangy.com

***Attorneys for Defendant***
***Union Pacific Railroad Company***

**CERTIFICATE OF SERVICE**

I certify that on the 27th day of February, 2026 the foregoing was filed electronically with the Court, which served all counsel of record using its ECF notification system.

*/s/ Lara C. de Leon*
Lara C. de Leon