**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **JIMMY SMITHSON,** | |
| Plaintiff, | |
| v. | Case No. 5:21-CV-01225-XR |
| **UNION PACIFIC RAILROAD COMPANY,** | |
| Defendant. | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S REPLY IN SUPPORT OF
<u>ITS RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

14357899v1

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. ARGUMENT AND AUTHORITIES ......................................................................... 1

    A.    Smithson's ADA Claims are Precluded by the FRSA and Smithson's Attempt to Distinguish *Turner* Fail.......................................................................................... 1

    B.    Smithson's Disparate Treatment Claim Still Fails as a Matter of Law. ....................... 4

        1.    Smithson Fails to Present Direct Evidence of Discrimination Under the ADA. 4

        2.    Regardless, Smithson Cannot Prove He is Qualified Under the ADA. ............. 6

            a.    Smithson cannot ignore the FRA's mandatory color vision standard. ....... 7

            b.    Smithson's work history and previous certifications are irrelevant........... 8

            c.    The Light Cannon is an appropriate "field test" under FRA regulations. .. 9

    C.    Smithson Is Not Entitled to Punitive Damages............................................................ 11

III. CONCLUSION........................................................................................................... 11

14357899v1

## TABLE OF AUTHORITIES

**Cases**                                                                                                               **Page(s)**

*Baker v. Union Pac. R.R. Co.*,
    580 F. Supp. 3d 647 (D. Neb. 2022) ....................................................................................45

*Bates v. UPS*,
    511 F.3d 974 (9th Cir. 2007) ................................................................................................7

*Bhd. Of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*
    972 F.3d 83 (D.C. Cir. 2020) ................................................................................................3

*Brasier v. Union Pac. R.R. Co.*,
    No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534 (D. Ariz., Jan. 9,
    2023) .....................................................................................................................................4

*Campbell v. Union Pac. R.R. Co.*,
    No. 4:18-cv-00522-BLW, 2020 WL 5300734 (D. Idaho, Sept. 4, 2020) .................................5

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*
    439 F.3d 894 (8th Cir. 2006) ................................................................................................7

*Cannizaro v. Neiman Marcus, Inc.*,
    979 F. Supp. 465 (N.D. Tex. 1997) .......................................................................................7

*Donahue v. Union Pacific Railroad Company*,
    Case No. 3:21-cv-00448, 2025 WL 1397505 (N.D. Cal., May 13, 2025) .........................5, 8

*EEOC v. BNSF Ry. Co.*,
    902 F.3d 916, 927 (9th Cir. 2018) .........................................................................................8

*Etienne v. Spanish Lake Truck & Casino Plaza, LLC*
    778 F.3d 473, 476 (5th Cir. 2015) ........................................................................................6

*Fulbright v. Union Pac. R.R. Co.*,
    No. 3:20-CV-2392-BK, 2022 WL 2022 ................................................................................4

*Hamilton v. Ortho Clinical Diagnostics*,
    No. 4:12CV00670 JLH, 2014 WL 2968497 (E.D. Ark., July 2, 2014) .................................5

*Hinojosa v. Jostens Inc.*,
    128 Fed. App'x. 364 (5th Cir. 2005) .....................................................................................4

*Kitchen v. BASF*,
    952 F.3d 247 (5th Cir. 2020) ................................................................................................5

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)), cert. denied, U.S., 143 S. Ct.
    745, 214 L. Ed. 2d 449 (2023) ............................................................................................11

ii

*Littlefield v. Nevada, ex. rel. Dept. Of Public Safety*,
    195 F. Supp. 3d 1147 (D. Nev. 2016)................................................................8

*Sanders v. Union Pac. R.R. Co.*,
    No. 4:20CV3023, 2021 WL 4783629 (D. Neb., Oct. 7, 2021).................................5

*Turner v. BNSF Railway Co.*,
    138 F.4th 224 (5th Cir. 2025) ............................................................ *passim*

*Wantou v. Wal-Mart Stores Tex., L.L.C.*,
    23 F.4th 422 (5th Cir. 2022) ...............................................................11

*Weeks v. Union Pac. R.R. Co.*,
    No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123 (E.D. Cal. May 3, 2017)............................2

**Statutes**

42 U.S.C. § 1981a(b)(1)................................................................11

**Regulations**

49 C.F.R. § 240.103(c)................................................................3

49 C.F.R. § 240.103(e)................................................................3

49 C.F.R. § 242.103(g) ...............................................................3

49 C.F.R. § 242.103(i) ...............................................................3

29 C.F.R. § 1630.2(m) ................................................................7

29 C.F.R. Pt. 1630 App. § 1630.14(c) .................................................5

29 C.F.R. § 1630.14(c)................................................................4

14357899v1

## I. INTRODUCTION

Plaintiff Jimmy Smithson ("Smithson") attempts to defeat summary judgment by asking the Court to pretend that Defendant Union Pacific Railroad Company ("UP") has no obligations to comply with the Federal Railroad Safety Act ("FRSA") or the Federal Railroad Administration's ("FRA") regulations that govern Smithson's position. Smithson all but suggests UP should have permitted him to continue working as a railroad conductor despite failing to obtain his FRA recertification because he was *previously* able to recertify under the FRA by passing UP's *former* color vision field test ("CVFT")–the very test that was criticized following the Goodwell, Oklahoma train collision. When Smithson could not later pass the *revised* CVFT, which was developed following the NTSB's directive under the discretion afforded by the FRA regulations, he argues the test was not valid and he was subject to discrimination.

As argued in UP's Motion and supported by the Fifth Circuit's recent decision in *Turner v. BNSF Railway Co.,* 138 F.4th 224 (5th Cir. 2025), Smithson's ADA claims fail because they are precluded by the FRSA. Even so, Smithson also fails to produce direct evidence of discrimination or prove he was "qualified" under the ADA; and Union Pacific's color vision protocols are—by law—job-related and consistent with business necessity. UP's summary judgment should thus be granted.

## II. ARGUMENT AND AUTHORITIES

A.  **Smithson's ADA Claims are Precluded by the FRSA and Smithson's Attempt to Distinguish *Turner* Fail.**

As previously outlined, the FRA provides aggrieved employees with an extensive appeals process, which Smithson did not follow. Smithson's Response attempts to convince the Court to disregard binding Fifth Circuit authority by factually distinguishing *Turner* is improvident.

1

14357899v1

As an initial matter, Smithson does not dispute the FRA has a dispute resolution process in which a person denied … certification may obtain a fresh determination by the FRA." *Weeks v. Union Pac. R.R. Co.*, No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123, at *7 (E.D. Cal. May 3, 2017); 49 § C.F.R 240.401(a)); § 242.501. Nor does he dispute he failed to take advantage of this process. It thus follows that Smithson's discrimination claims fail. As the *Turner* court noted: "If Turner believes that he deserves certification despite BNSF's efforts to comply with the rules, he must go to the font of that decision- and rule-making authority: the FRA. ***That is why this court has required administrative exhaustion in cases like this where an employment action was based on the failure to satisfy standards established by statute or regulation.***" 138 F.4th at 231 (emphasis added). For these reasons, Smithson's claims should be dismissed.

To avoid application of the *Turner* case, which at least one other court in this district has followed in a similar case (*see* Exh. KK to UP's MSJ), Smithson disingenuously implies that the *Turner* court's decision hinged on a "finding" that BNSF's test was "FRA-approved", whereas he claims the UP test was not. *See* ECF. No. 72 at p. 8. Indeed, Smithson recasts the court's finding thus: "because there was no question in the record that the BNSF field test had been approved by the FRA, the conductor's inability to pass it was a de facto failure to meet FRA standards." *See id* at p. 9. Yet the *Turner* court referenced no such analysis or facts related to the approval of BNSF's field test. Indeed, the *Turner* court was reviewing a ***motion for judgment on the pleadings***, so any argument that the court analyzed extraneous facts on this issue is wholly inaccurate.

Further, Smithson's own evidence shows that UP made multiple submissions of its certification programs to the FRA. Critically, he offers no legal or regulatory authority that defines the level of specificity in the submission, the form and content of the "formal approval" he claims

2

14357899v1

is required.[1] In fact, the case on which Smithson relies for his faulty proposition that UP was required to get its CVFT approved by the FRA, actually refutes this position. In *Bhd. Of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, the court noted:

> The Railroad Administration does not issue any formal documentation approving a railroad's written certification program. Rather, the Railroad Administration has adopted a passive approval system. Under that scheme, *if the Railroad Administration does not notify the railroad—in writing and within thirty days of submission—that the written certification program fails to meet the minimum regulatory criteria, then the program "is considered approved and may be implemented" by the railroad.* 49 C.F.R. §§ 240.103(c), 242.103(g). The Railroad Administration's regulations are explicit that "[n]o formal approval document [regarding certification program submissions] will be issued by the [Administration]." *Id.* § 240 App. B (engineer programs); *id.* § 242 App. B (conductor programs).
>
> Any material modifications to a previously approved certification program must also be submitted for the Railroad Administration's approval either thirty days (engineer programs) or sixty days (conductor programs) before implementation. *See* 49 C.F.R. §§ 240.103(e), 242.103(i). Those modifications are likewise approved passively by the Railroad Administration if not explicitly rejected within thirty days after submission. *See id.* §§ 240.103(e)(3), 242.103(i)(3).

972 F.3d 83, 89–90 (D.C. Cir. 2020).

Smithson also does not proffer any authority that indicates that UP's submissions were in any way faulty or rejected by the FRA. Indeed, he cannot as no such notification ever existed. Thus, according to Smithson's own (and lone) authority and admissions, the FRA *did* approve UP's Light Cannon CVFT, albeit passively. This is the precise reason why the regulatory appeals process exists, and why a plaintiff must first exhaust the FRA's remedies regarding the certification denial before asking a judge and jury to do so. Smithson's attempt to distinguish *Turner* fails, and UP should be granted summary judgment.

---

[1] Smithson's Response internally contradicts his own argument here. On the one hand, he tries to argue this Court should disregard *Turner* because there is some (unidentified) "formal" approval needed from the FRA, but then argues on the other that UP's Light Cannon test is invalid because no such FRA approval is required.

**B.** **Smithson's Disparate Treatment Claim Still Fails as a Matter of Law.**

Smithson cannot show that UP acted with discriminatory intent through direct evidence, nor can he show that its decision to remove him from service was pretext for discrimination. He also has failed to show he is a "qualified individual with a disability," a crucial prima facie element of his discrimination claim. All of which doom his claims.

**1.** **Smithson Fails to Present Direct Evidence of Discrimination Under the ADA.**

Smithson contends there was direct evidence of discrimination, generally referencing documents signed by UP's CMO Dr. Holland during the FFD evaluation. ECF No. 72, pp. 7-8 (citing PPSF ¶ 54-62). However, his argument fails to acknowledge that the Fifth Circuit has made clear that evaluating an employee's medical condition during an FFD process to ensure the condition does not prevent them from performing their essential job functions is neither an improper criterion nor an adverse action. *See* ECF 69, p. 28 (quoting *Hinojosa v. Jostens Inc.*, 128 Fed. App'x. 364, 368 (5th Cir. 2005) and 29 C.F.R. § 1630.14(c)).

Ignoring this, Smithson argues that "multiple courts agree" that removing an employee from service who fails to satisfy mandatory FRA color vision standards is direct evidence of discrimination. ECF No. 72, p. 13. Yet none of these cases stands for this proposition, nor do they involve a plaintiff who was removed from service after failing to meet legally binding standards applicable to their positions. *See, e.g., Fulbright v. Union Pac. R.R. Co.*, No. 3:20-CV-2392-BK, 2022 WL 2022 WL 975603, at *2 (N.D. Tex., March 31, 2022) (Senior Communications Technician was removed from service to undergo a FFD evaluation after taking Trazodone and falling asleep when he was supposed to be "on call."); *Brasier v. Union Pac. R.R. Co.,* No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534, at *1-2 (D. Ariz., Jan. 9, 2023) (conductor required to undergo a FFD evaluation after brain surgery and before returning to work); *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 652 (D. Neb. 2022) (switchman removed from service

4

to undergo a FFD evaluation after self-reporting headaches and dizziness); *Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2021 WL 4783629, at *2 (D. Neb., Oct. 7, 2021) (foreman general was removed from service to undergo a FFD evaluation after suffering cardiac arrest and being diagnosed with acute kidney failure during ulcer surgery); *Campbell v. Union Pac. R.R. Co.*, No. 4:18-cv-00522-BLW, 2020 WL 5300734, at *1 (D. Idaho, Sept. 4, 2020) (trainman removed from field training to undergo FFD evaluation after supervisor observed him limping); *Hamilton v. Ortho Clinical Diagnostics*, No. 4:12CV00670 JLH, 2014 WL 2968497, at *1 (E.D. Ark., July 2, 2014) (plaintiff was a field engineer who was terminated after taking medical leave for a work-related back injury and being issued permanent lifting restrictions). Further, *Fulbright*, *Brasier*, *Baker*, *Sanders* and *Campbell* are also flawed to the extent they ignore UP's express ability under the ADA "to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630 App. § 1630.14(c).[2]

Smithson's direct evidence argument presumes Dr. Holland issued restrictions because of his color vision deficiency <u>itself</u> rather than his correlating inability to satisfy federally mandated vision standards for his position. This presumption requires an inference—the antithesis of direct evidence. *Accord Kitchen v. BASF,* 952 F.3d 247, 252 (5th Cir. 2020) (firing employee based on the results of his breath alcohol test "is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics" because an inferential leap would be required to arrive at that conclusion.); *Donahue v. Union Pacific Railroad Company*, Case No. 3:21-cv-00448, 2025 WL 1397505, *8 (N.D. Cal., May 13, 2025) (granting summary judgment to UP and finding that documents signed

---

[2] Separately, the findings of direct evidence in *Brasier*, *Baker* and *Sanders* relied on alleged admissions or concessions by UP that have not been made in this case.

14357899v1

by UP's CMO containing the language "color vision deficit" was not direct evidence of discrimination).

Also inapposite here are the four-factors used by the court in *Etienne v. Spanish Lake Truck & Casino Plaza, LLC* "[t]o determine whether comments in the workplace constitute direct evidence or only stray remarks." 778 F.3d 473, 476 (5th Cir. 2015) (quotation omitted). In *Etienne*, the Fifth Circuit held that an affidavit of a former manager constituted direct evidence of race and color-based discrimination for purposes of summary judgment because it contained statements demonstrating the plaintiff's manager allocated responsibilities to employees based on the color of their skin and believed the plaintiff was "too black" to perform various tasks. *Id*. at 476. In short, Smithson attempts to compare Dr. Holland's references to his "color vision deficit" and "hereditary color vision deficiency" in various FFD documents to an affidavit stating that an employee was "too black" to perform various job duties. *Id*. This comparison is illogical and misplaced. <u>First</u>, Dr. Holland's reference to Smithson's his "color vision deficit" and "hereditary color vision deficiency" as opposed to his FRA disqualification *based on* his color vision deficit is a distinction without a difference. <u>Second</u>, Smithson's distorted analogy ignores fundamental differences between the ADA and other employment discrimination statutes, including Title VII. Unlike other employment discrimination laws, an employee's medical condition may be relevant to job qualifications in a way that the employee's race, sex, or national origin almost never are. Here, UP was *required* to evaluate Smithson's color vision acuity and to ensure he met the FRA's standards for the same, and referencing a condition is a by-product of that requirement. Thus, Smithson has failed to show direct evidence of discrimination.

### 2. Regardless, Smithson Cannot Prove He is Qualified Under the ADA.

Smithson only pleads that UP "regarded" or "perceived" him as disabled under the ADA. ECF No. 1, ¶ 42. Thus, UP had no duty to accommodate his medical restrictions so he could

14357899v1

continue working as a conductor. "[T]he duty to make reasonable accommodation arises only when the individual is actually disabled; no such duty arises when the individual is merely regarded as being disabled [under] the ADA." *Cannizaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 475 (N.D. Tex. 1997) (quotation omitted). Thus, to prove he is "qualified", Smithson must show he can perform his essential job functions <u>without</u> accommodation—which he cannot.

### a.    Smithson cannot ignore the FRA's mandatory color vision standard.

EEOC regulations make clear that a qualified individual is one who "satisfies the requisite skills, experience, education and other job-related requirements" of the position. 29 C.F.R. § 1630.2(m). Here, it is undisputed that UP's conductors must be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. FRA regulations mandate that railroad conductors pass a color-vision screening every three years to be recertified. It is also undisputed that Smithson failed his initial 14-plate Ishihara test in 2018, after which UP afforded him the opportunity to take its CVFT—the Light Cannon. Finally, it is undisputed that Smithson failed the CVFT and, as a result, UP denied his FRA recertification.

Citing *Bates v. UPS*, 511 F.3d 974, 988 (9th Cir. 2007), Smithson asks the Court to ignore the FRA's mandatory color vision standards for conductors and overlook his inability to be recertified because UP "is the arbiter of whether Smithson could be certified." ECF No. 72, p.17. Smithson's reliance on *Bates* is misplaced. In *Bates*, the employer—***of its own volition***—required its non-DOT drivers to meet the same regulatory hearing standard applicable to its DOT-drivers. 511 F.3d at 988. As such, the court determined the employer's self-imposed standard was "facially discriminatory"—analogizing it to an employer's *sua sponte* policy requiring employees to be "100%" or "fully healed" before returning to work. *Id*. (quotations omitted).

Likewise, other cases from outside the Fifth Circuit, which Smithson cites, are also distinguishable and fail to support his position. For example, the court in *Canny v. Dr.*

7

14357899v1

*Pepper/Seven-Up Bottling Grp., Inc.*, relied on the plaintiff's testimony that "he maintained a forklift license" and the defendant's concession that it "had no minimum vision acuity requirement for driving a forklift" in finding there was sufficient evidence he could perform the essential job functions of a warehouse loader. 439 F.3d 894, 901 (8th Cir. 2006) (emphasis added); *see also Littlefield v. Nevada, ex. rel. Dept. Of Public Safety*, 195 F. Supp. 3d 1147, 1156-57 (D. Nev. 2016) (facially discriminatory binocular vision requirement was a "blanket safety-based qualification standard—beyond the essential job function—that is not mandated by law…") (emphasis added). Similarly, in *EEOC v. BNSF Ry. Co.*, the defendant "[made] no attempt to argue that [the plaintiff] was not [qualified]" and "conceded that the medical information it had on [the plaintiff] at the time" demonstrated he could perform the position for which he received a conditional job offer. 902 F.3d 916, 927 (9th Cir. 2018).

Here, there is no dispute the conductor position is governed by binding FRA regulations— including regulations for color-vision acuity. As the Fifth Circuit has stated, "we refuse to force employers into a choice between the rock of ADA liability and the hard place of regulatory violation." *Turner*, 138 F.4th at 231. So too should this Court and find that Smithson was not qualified under the ADA.

### b.    Smithson's work history and previous certifications are irrelevant.

Smithson suggests his inability to be recertified in 2018 can be ignored because he "worked without missing a signal for nearly 12 years" and was able to pass UP's previous CVFT and was previously evaluated in the field. *See* ECF No. 72, p. 18. The court in *Donahue* was also not persuaded by this same argument when the plaintiffs attempted to rely on their work history too. *See Donahue*, 2025 WL 1397505, at *6-7. Again, these arguments are immaterial and contrary to the FRA's color vision acuity requirements with which UP is legally mandated to comply.

14357899v1

Smithson's argument also ignores the FRA and NTSB's responses to the Goodwell collision *criticizing* UP's use of its previous CVFT and instructing UP to replace it.

### c.        The Light Cannon is an appropriate "field test" under FRA regulations.

Smithson also claims the Light Cannon test is invalid and "does not comply with FRA regulations for the development and implementation of color-vision tests." ECF No. 72, p. 21.[3] Smithson's arguments are circular and mischaracterize the undisputed evidence. On the one hand, he agrees that FRA regulations "include a requirement that railroads determine whether employees can recognize and distinguish colored railroad signals". *Id*. p. 19. He also agrees "the FRA leaves the development of the subsequent testing process *to the railroad*" if a conductor fails a threshold assessment (such as the 14-plate Ishihara test), "merely stating that such testing should take the form of ophthalmological referral, *field testing*, or other practical color testing." *Id*. (citing the regulations in PSSF ¶¶ 1-5) (emphasis added). Nonetheless, he claims this discretion would allow a jury to find that UP's color vision policies "are its own" and cannot be shielded by the FRA's regulations.

Despite acknowledging the FRA does not mandate specific testing protocols, Smithson argues UP's CVFT does not satisfy unspecified "minimum standards for field and scientific testing." *Id*. at p. 20. Specifically, he paints the Light Cannon as a "scientific test" for which FRA guidance requires "a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication." *Id*. But this is **_contrary_** to the FRA guidance Smithson on which attempts to rely—which describes a "practical" or "field" test within the railroad community as

---

[3] Indeed, if Smithson wished to challenge the validity of the Light Cannon test, his recourse is to seek appeal with the FRA, which he admittedly did not do. *See Turner*, 138 F.4th at 229 ("although portions of the certification process are implemented by railways themselves… the process— including vision test approval, is within the province of the FRA… This requirement is *not* optional" for the railroad companies.).

14357899v1

one that, like the Light Cannon, is performed outdoors under testing conditions that reasonably match actual operating or working conditions. Smithson also fails to discuss that the FRA has repeatedly referred to the Light Cannon test a "field test."

Smithson also erroneously argues that UP "failed to validate [the Light Cannon] per FRA regulations." *See id.* Yet, the FRA never imposed any "validation" requirement under its best practices—which are "intended to guide" railroads and "broadly drafted to allow each railroad to develop field testing procedures that will work for its own operational environment and to consider the unique medical circumstances of each examinee tested." *See* UP's MSJ, ECF No. 69, p. 32; AOE 056, Ex. F at p. 5. Plus, per the FRA Best Practices, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." *See* UP's MSJ, ECF No. 69, p. 32; SOF ¶ 30.[4]

Contrary to this unsupported assertion, the undisputed record demonstrates that UP worked extensively to ensure that the Light Cannon reasonably matched actual conditions. After Drs. Ivan and Rabin prepared a report recommending changes to a *prototype* of the Light Cannon that was never used, the doctors testified that the test was "was representative of what was being used on the lines" and "a valid field test which simulates their real-world demands." *See* ECF No. 74. p. 16.

Finally, Smithson also suggests the Court should ignore the FRA's express approval of the Light Cannon because "there is no evidence in the record that the FRA ever completed an evaluation of the test or produced any assessment of its validity." ECF No. 72, p. 21. Smithson fails to cite or offer any authority suggesting the FRA is prohibited from finding a field test

---

[4] *Accord Turner*, 138 F.4th at 230 (citing Best Practices, the "test conditions must 'reasonably match' the operating and working conditions the conduct will experience in the field, which differ between railways.").

14357899v1

complies with its own regulations without "validating" it; and he also ignores that FRA safety administrators evaluated the Light Cannon in person and when Joseph Riley, former Specialist of Operating Crew Management in the FRA's operating practices division, learned about the Light Cannon, he "saw nothing that would warrant a violation of anything." *See* ECF 69, ¶¶ 43-44.

Smithson's personal beliefs that UP should have used a different field test or scientifically validated the Light Cannon before using it are immaterial and—importantly—not required by the FRA. Smithson failed to satisfy the FRA's color vision standards necessary for recertification as a conductor. He is not "qualified" under the ADA and his disparate treatment claim fails.

**C.      Smithson Is Not Entitled to Punitive Damages.**

Finally, Smithson makes a loose assertion that UP acted with reckless indifference, entitling him to punitive damages. Yet he may recover punitive damages only if he demonstrates that UP engaged in "a discriminatory practice…with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The terms "malice" and "reckless indifference" "focus on the actor's state of mind" and both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination [or retaliatory conduct]." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 439 (5th Cir. 2022) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)), cert. denied, U.S., 143 S. Ct. 745, 214 L. Ed. 2d 449 (2023). That is not the case here. The undisputed evidence shows that UP acted directly under the guidance of federal law, which requires that conductors be recertified by the FRA, in removing Smithson from service when he failed to receive his recertification after failing both the valid Ishihara and Light Cannon test.

### III. CONCLUSION

For the foregoing reasons, the Court should grant UP summary judgment on Smithson's remaining claims of disparate treatment and disparate impact under the ADA.

11

Respectfully submitted this 27th day of March, 2026,

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

*/s/ Lara C. de Leon*
Lara C. de Leon (TX #24006957)
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (512) 382-8800
ldeleon@constangy.com

**Attorneys for Defendant**
**Union Pacific Railroad Company**

## CERTIFICATE OF SERVICE

I certify that on the 27th day of March, 2026 the foregoing was filed electronically with the Court, which served all counsel of record using its ECF notification system.

*/s/ Lara C. de Leon*
Lara C. de Leon

14357899v1